812 So.2d 45 (2002)
Barry HOERNER and Peggy Rieffel Hoerner
v.
ANCO INSULATIONS, INC.; ACandS, Inc.; Armstrong World Industries, Inc. (Formerly Armstrong Cork Company); Asbestos Claims Management Corporation (Formerly National Gypsum Companyj); The Babcock & Wilcox Company; Branton Insulations, Inc.; et al.
No. 2000-CA-2333.
Court of Appeal of Louisiana, Fourth Circuit.
January 23, 2002.
As Corrected on Denial of Rehearing March 4, 2002.
As Corrected On Grant of Rehearing April 4, 2002.
*51 Gerolyn P. Roussel, Perry J. Roussel, Jr., Roussel & Roussel, LaPlace, LA, Counsel for Plaintiffs/Appellants.
James R. Logan, IV, Logan & Soileau, LLC, New Orleans, LA, Counsel for the Home Insurance Co.
*52 Samuel M. Rosamond, III, Fleming & Rosamond, L.L.P., Metairie, LA, Counsel for Commercial Union Insurance Co.
Janet MacDonell, Andre C. Broussard, Jr., A. Wendel Stout, III, Deutsch, Kerrigan & Stiles, New Orleans, LA, Counsel for T&N, PLC and Phone-Poulene AG Company, Etc.
Douglas Kinler, Michael Harold, Susan B. Kohn, Simon, Peragine, Smith & Redfearn, New Orleans, LA, Counsel for McCarty Corp. and Harold Thomas Branton.
Glen E. Mercer, David P. Salley, Sessions, Fishman & Nathan, L.L.P., New Orleans, LA, Counsel for Maryland Casualty Company.
Lawrence G. Pugh, III, Alison S. Borison, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, LA, Counsel for Eagle, Inc., Fred Schuber, Jr., and Fred Schuber, III.
Court composed of Judge STEVEN R. PLOTKIN, Judge, DENNIS R. BAGNERIS, SR., Judge MICHAEL E. KIRBY.
Judge STEVEN R. PLOTKIN.
Borrowing on a phrase from Mrs. Gump, asbestos litigation is like a box of chocolates the outer covering is familiar, but the taste inside is different, and one never knows what one is going to get.
We begin our analysis with the observation that this toxic tort case is one of many in litigation. This case presents factual and legal issues that pervade the pending asbestos litigation in Louisiana. This court has thoroughly reviewed the extensive record and the complex factual and legal issues presented in this appeal, in order to provide guidance for pending and future cases.
This appeal involves numerous challenges to a judgment issued by an ad hoc trial judge based on a jury verdict awarding plaintiffs Barry and Peggy Hoerner a total of $475,000 to compensate them for damages flowing from Mr. Hoerner's contraction of asbestosis. Virtually all of the party defendants who were present at trial and cast in judgment have appealed. The Hoerners have both answered those appeals and filed cross-appeals concerning various issues. We affirm in part, reverse in part, and render.

I. FACTS
Mr. Hoerner was exposed to asbestos-containing products between 1957 and 1982, while working as an insulator for various New Orleans area insulating companies as a member of the Asbestos Workers' Union Local 53. Mr. Hoerner testified that he worked on hundreds of jobs during his years as a union worker, some of them as short as hours or days, and others lasting much longer periods of timeyears in some cases. The Hoerners claim that Mr. Hoerner was exposed to dangerously high levels of asbestos on a daily basis for years, as a routine part of his work responsibilities. According to the Hoerners, sometimes the exposure occurred because Mr. Hoerner himself or one of his co-employees was actually cutting and working with asbestos-containing products. Other times the exposure occurred because of work being performed by employees of other insulating companies working on the same jobsite as Mr. Hoerner. Mr. Hoerner retired from the union and from his employment as an asbestos worker in 1982.
On December 19, 1995, the Hoerners filed the instant suit, originally naming numerous individual defendants alleged to be liable for Mr. Hoerner's occupational exposure to asbestos-containing products. *53 Prior to trial in the matter, the Hoerners entered settlement agreements with a number of named defendants.
Following the trial, a jury returned a verdict in favor of the Hoerners and against all of the defendants at trial, as well as 18 other non-party defendants, who either had not been named by the Hoerners or had settled with the Hoerners prior to trial. The jury awarded the following damages to the Hoerners:

Mr. Hoerner's past, present and future
 physical pain and suffering $150,000
Mr. Hoerner's past, present and
 future physical disability 150,000
Mr. Hoerner's past, present and
 future mental suffering 150,000
Mr. Hoerner's past and future medical
 expenses 20,000
Mr. Hoerner's past and future loss
 of wages and earning capacity 0
Mrs. Hoerner's loss of consortium,
 service and society 5,000
 _______
TOTAL $475,000

The trial court entered judgment in accordance with the jury verdict against the following entities: Armstrong World Industries, Inc., formerly Armstrong Cork Co.; Asbestos Claims Management Corp., formerly National Gypsum Co.; GAF Corp., formerly The Ruberiod Co.; T & N, PLC.; Rhone-Poulenc AG Co., formerly Benjamin Foster, Division of Amchem Products; Eagle, Inc., formerly Eagle Asbestos & Packing Co., and its insurers, Commercial Union Insurance Co. and The Home Insurance Co.; Fred Schuber Jr. and his insurers, Commercial Union Insurance Co. and The Home Insurance Co.; Fred Schuber III and his insurers, Commercial Union Insurance Co. and The Home Insurance Co.; The McCarty Corp., formerly McCarty-Branton, Inc., and its insurer, Commercial Union Insurance Co.; Marvin R. McCarty and his insurer, Commercial Union Insurance Co.; Harold Thomas Branton and his insurer, Commercial Union Insurance Co.; Commercial Union Insurance Company in its capacity as an insurer of Eagle, Fred Schuber Jr., Fred Schuber III, McCarty, Mr. McCarty, and Mr. Branton; The Home Insurance Company, in its capacity as an insurer of Eagle, Mr. Schuber Jr., and Mr. Schuber III; and Maryland Casualty Co., in its capacity as an insurer of Marquette Insulations.
The trial court also ordered that the total judgment be reduced by one virile share for each of the following non-party defendants, each of whom settled with the Hoerners prior to trial, but were nevertheless found liable by the jury for Mr. Hoerner's asbestosis: Owens-Corning Corp., Pittsburg-Corning Corp., Flintkote, Uniroyal, Inc., Johns-Manville, Armstrong Contracting & Supply, ANCO, Reilly-Benton, and Taylor-Seidenbach. The trial judge also reduced the judgment by one-third of one virile share for the liability the jury assigned to Fidelity and Casualty Insurance Co.
Appeals were filed by the following defendants: Eagle and its executive officers, Mr. Schuber Jr. and Mr. Schuber III; McCarty and its executive officers, Mr. McCarty and Mr. Branton; T & N; Rhone-Poulenc; Home Insurance; and Maryland Casualty Co. The Hoerners' answered the various appeals and filed a cross-appeal. The various parties to the instant appeal present numerous liability, quantum, insurance, and evidentiary issues, as set forth more fully below.

II. STANDARD OF REVIEW AND BURDEN OF PROOF
Generally, an appellate court may not reverse a factual finding of the trial court unless it makes both of the following findings: (1) that a reasonable factual basis for the trier of fact's finding does not exist in the record, and (2) that the record establishes that the finding is manifestly erroneous or clearly wrong. *54 Ruby v. Jaeger, 99-1235, p. 4 (La.App. 4 Cir. 3/22/00), 759 So.2d 905, 907, writ denied, XXXX-XXXX, 200-1397 (La.6/30/00), 766 So.2d 542. The issue to be decided is whether the factfinder's conclusion was a reasonable one. Id., citing Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880 (La.1993). We recognize this standard of review and will apply it to the jury's factual findings in the instant case.
We are also cognizant of the principles governing the burden of proof in tort cases, which also must be considered by this court in order to determine the issues presented by this appeal. The following explanation of those principles is taken from F. Maraist and T.C. Galligan, Louisiana Tort Law (Charlottesville, VA: Michie Law Publishers, 1996):
The burden of proof consists of two separate but intertwined elements: the burden of persuasion and the burden of producing evidence. The first element the burden of persuasionestablishes which party must persuade the trier of fact, and the level of persuasion that the trier of fact must reach. The second elementthe burden of producing evidencespeaks to whether the party who bears the burden of persuasion has made a prima facie case, i.e., has produced evidence sufficient to allow the factfinder to conclude that the party has established each element of his case at the applicable level of persuasion. This second element may be referred to as the burden of going forward with the evidence.
Id. at 173.
As indicated by the above quotes, determination of whether a trial court judgment is manifestly erroneous involves both of the following queries: (1) Did the party bearing the burden of proof carry the burden of persuasion (i.e., whether its evidence is more persuasive than that presented by its opponent), and (2) Did the party bearing the burden of proof carry the burden of presenting evidence (i.e., whether the evidence presented is sufficient to prove its cause of action). A review of Louisiana jurisprudence reveals that the discussion of the manifest error standard of review by appellate courts often focuses on issues applicable only to the burden of persuasion, such as the deference to be given a trial court's evaluations of credibility and inferences of fact. See, i.e., Sportsman Store of Lake Charles, Inc. v. Sonitrol Security Systems of Calcasieu, Inc., 99-0201, pp. 6-7 (La.10/19/99), 748 So.2d 417, 421. However, a party may carry its burden of persuasion and nevertheless fail to carry its burden of producing evidence. In the latter case, the party has failed to carry its burden of proof.
Moreover, if an appellate court finds that a trial court has entered judgment in favor of a party that has failed to carry its burden of proof, that finding is tantamount to a finding "that a reasonable factual basis for the trier of fact's finding does not exist in the record," and "that the record establishes that the finding is manifestly erroneous or clearly wrong." Ruby, 99-1235 at 4, 759 So.2d at 907. Accordingly, an appellate court may reverse a trial court's judgment in favor of a party if it finds that that party failed to carry its burden of proof.

III. LIABILITY ISSUES
The test previously adopted by this court to determine whether one of several possible sources of asbestos exposure should be held liable to a plaintiff who has contracted asbestosis is whether the plaintiffs exposure to asbestos-containing products manufactured, owned, or controlled by that defendant constitutes a "substantial factor" in causing his asbestosis. See *55 Quick v. Murphy Oil Co., 93-2267, p. 12 (La.App. 4 Cir. 9/20/94), 643 So.2d 1291, 1296. This court further stated as follows in In re Asbestos v. Bordelon, Inc., 96-0525 (La.App. 4 Cir. 10/21/98), 726 So.2d 926:
In asbestos cases, the term "exposure" refers to inhalation of asbestos fibers into the lungs. Therefore, in order for such exposure to result in an asbestos-related disease, the claimant must show that he had significant exposure to the product complained of to the extent that it was a substantial factor in bringing about his injury. See Egan, 677 So.2d at 1035. Without frequent, regular exposure to Flexitallic's gaskets by the plaintiffs, we are without authority to say that the plaintiffs' handling of Flexitallic gaskets was a substantial factor in the causation of their injuries. See Cole, 599 So.2d at 1066.
Id. at 30; 726 So.2d at 948-49.
At trial, the Hoerners presented the following evidence through the expert testimony of Frank M. Parker, III, a certified industrial hygienist and safety professional. Asbestosis was recognized as a health hazard associated with asbestos exposure in 1957, when Mr. Hoerner became a union worker. In fact, asbestos exposure was added to the Louisiana Worker's Compensation Act in 1952. Thus, both employers and manufacturers should have known about the health hazards associated with asbestos during the time that Mr. Hoerner was a union worker. Moreover, non-asbestos-containing materials were available throughout that time.
Asbestos generally cannot be detected with the senses, a fact that makes asbestos very dangerous for workers. Moreover, visible dust almost always includes concentrations of asbestos higher than the industry standard. In fact, visible dust contains some five million particles per cubic foot, a dangerous concentration. Nevertheless, many employers in the 1960's and 1970's did not take any safety precautions to protect their employees from asbestos exposure, such as ventilation systems, training, respiratory protection, or basic engineering controls. Although the 1963 Master Insulators' Contract required the use of respirators to protect workers from bodily harm, including dangerous dust, most employers did not provide respirators. Some employers offered paper dust masks to employees, but the paper dust masks available in the 1960's were not approved to protect employees against asbestos exposure. Work situations where one contractor's employees were working next to another contractor's employees violated federal standards.
Manufacturers were the primary source of information to the user about products they manufactured. In fact, distributors and contractors have a right to expect manufacturers to warn them of problems with their products. Although some products were exempt, the Code of Federal Regulations at the time Mr. Hoerner worked as an insulator required warnings on thermal insulation, pipe covering, asbestos paper, and anything else that released fiber when cut. However, those standards do not necessarily apply to employers and distributors that were not involved in government contracts.

A. Liability of Eagle and McCarty
In their petition, the Hoerners alleged multiple theories of liability against a number of Mr. Hoerner's previous employers, including Eagle and McCarty. Specifically, the Hoerners alleged that Eagle and McCarty were liable for Mr. Hoerner's exposure to asbestos both while he was employed by those companies, and while he was not employed by those companies, *56 but was working on jobsites alongside employees of those companies. The Hoerners also alleged liability on the part of Eagle and McCarty as "professional vendors" of asbestos-containing products. Finally, the Hoerners alleged liability against the executive officers of Eagle and McCarty.
Prior to trial in the matter, the trial judge entered partial summary judgment in favor of Eagle and McCarty, as well as the other defendants who had employed Mr. Hoerner, finding that neither employers nor their insurers could be held liable to the Hoerners for Mr. Hoerner's exposure to asbestos products during any period of time Mr. Hoerner was actually employed by those companies, because workers' compensation is the Hoerners' exclusive remedy against his employers. LSA-R.S. 23:1032(A). However, the court partially denied summary judgment with respect to coverage for any period of time Mr. Hoerner was exposed to asbestos products manufactured, sold, and distributed by the defendant companies, when Mr. Hoerner was not employed by those companies.

1. Liability as employers of other insulators
Following the trial in this matter, the jury answered "yes" to the following questions concerning Eagle and McCarty:
11. Do you find, by a preponderance of the evidence, that Barry Hoerner was significantly exposed to unreasonably dangerous asbestos containing products sold or installed by the following defendant during periods of time when Barry Hoerner was not employed by these corporations and this exposure was a substantial factor in bringing about his injury-asbestosis?
* * * * *
14. Do you find, by a preponderance of the evidence, that any of the following defendants were negligent in the sale or installation of unreasonably dangerous asbestos products to which Barry Hoerner was significantly exposed when he was not an employee of the company, and this exposure was a substantial factor in bringing about his injury-asbestosis?
Eagle and McCarty appeal the jury's findings on the above issues.

a. Eagle
On appeal, Eagle asserts that the Hoerners failed to carry their burden of proving by a preponderance of the evidence that Mr. Hoerner's exposure to asbestos released into the air by its employees on jobsites when Mr. Hoerner was working for other employers was a substantial factor in causing his asbestos, as required by Quick. Eagle claims that the "substantial factor" test requires that the plaintiff present evidence that exposure was frequent, regular, and proximate, citing Bordelon, but adding "proximate" to the requirements stated by that case. Although we agree that the asbestos exposure must be "proximate," as that word generally means "in relationship to," we note that no requirement exists in law compelling a plaintiff in an asbestos case to prove that asbestos exposure from a specific source is the proximate cause of his or her disease. Under the standards set forth in Quick and Bordelon, the correct standard for fulfilling the substantial factor test is proof that the exposure was frequent and regular. Thus, this court will review the evidence presented related to Mr. Hoerner's exposure to asbestos-containing products being used by Eagle employees when Mr. Hoerner was not employed by Eagle in order to determine whether the Hoerners carried their burden of proving that such *57 exposure was a substantial factor in causing Mr. Hoerner's asbestosis because that exposure was regular and frequent.
Mr. Hoerner testified that he was employed by Eagle as an insulation helper and mechanic at various times in 1958, 1965, 1967, 1971, and 1974, working on vessels and doing industrial and commercial insulation work. Of course, Eagle cannot be held liable for Mr. Hoerner's exposure to asbestos-containing products when he was employed by Eagle. However, Mr. Hoerner also stated that he saw Eagle products on a few jobsites when he was working for other employers, particularly when Eagle employees were also working on the same site. During those jobs, Mr. Hoerner worked in the same vicinity as Eagle employees, and was therefore exposed to Eagle's thermal insulation products.
Retired Local 53 member Paul Walther testified at trial that he worked with Mr. Hoerner in approximately 1965 and 1966 for B & B Contractors at the Union Carbide plant, although they worked in different crews in different parts of the building. Accordingly to Mr. Walther, Eagle employees worked from the back of the benzine unit forward at the same time that B & B employees worked from the front of the unit backward until the two units met. As a result, Eagle workers and B & B workers were working in the same vicinity, all applying asbestos pipe covering. In order to complete the project, workers were required to cut the pipe covering with saws. Although the project lasted for some 18 months, Eagle and B & B workers did not work in the same vicinity for that long. Nevertheless, Mr. Walther opined that Mr. Hoerner was exposed to dust from Eagle's products. Mr. Walther said that the asbestos pipe covering used by Eagle workers on the Union Carbide job came from boxes bearing Eagle's name; those boxes contained no warnings. Much of Mr. Walther's testimony was corroborated by retired Local 53 member Wayne Coates, who also worked with Mr. Hoerner for B & B on the Union Carbide job. In fact, Mr. Coates said that Mr. Hoerner was a foreman supervising 10 to 15 men on that job.
Eagle Vice President Fred Schuber III, who worked on the Union Carbide job one summer when he was a college student, testified on direct examination that that job involved some 50 or 60 people working on a "cold job" some one-half to two-thirds mile from River Road. Because it was a "cold job," Eagle mostly used foamglass, which does not contain asbestos, on the project. Although B & B employees were also working on the job site, Mr. Schuber III said that they were assigned to a unit in the front part of the plant close to River Road. As a result, Eagle employees and B & B employees did not work side-by-side. In fact, insulation contractors never worked side-by-side in his experience, because most insulation projects were too small to require more than one contractor.
However, on cross-examination, Mr. Schuber III admitted that he spent a lot of time working in a trailer on site during the summer he was employed by Eagle at the Union Carbide plant; he never did any insulation work at Union Carbide. Nevertheless, Mr. Schuber III insisted that he knew that no asbestos-containing products were required by the specifications on that job.
We find no manifest error in the jury's conclusion that the Hoerners carried their burden of proving by a preponderance of the evidence that Mr. Hoerner's exposure to asbestos released into the air by Eagle employees on jobsites when Mr. Hoerner was working for another employer was a substantial factor in causing Mr. Hoerner's asbestosis because his exposure *58 was frequent and regular. Because the Hoerners' carried their burden of proof on this issue, we affirm the judgment to the extent it imposes liability on Eagle as an employer of other insulators.

b. McCarty
The evidence presented at trial indicates that the McCarty-Branton Corp. was originally incorporated in the latter part of 1956. That corporation continued to exist until 1966, when the company became the McCarty Corp. For simplicity, we will refer to both companies as "McCarty" for purposes of this opinion. As with Eagle, in order to determine whether the trial court properly imposed liability on McCarty as an employer of other insulators, this court will review the evidence presented related to Mr. Hoerner's exposure to asbestos-containing products being used by McCarty employees when Mr. Hoerner was not employed by McCarty in order to determine whether the Hoerners carried their burden of proving that such exposure was a substantial factor in causing Mr. Hoerner's asbestosis because that exposure was regular and frequent.
As noted above, the jury found that McCarty was liable to the Hoerners because Mr. Hoerner was "significantly exposed to unreasonably dangerous asbestos containing products sold or installed by [McCarty] during periods of time when Barry Hoerner was not employed by [McCarty] and this exposure was a substantial factor in bringing about his injury-asbestosis." However, as McCarty notes in brief to this court, the record is devoid of any testimony that Mr. Hoerner worked in the immediate vicinity to any McCarty employee on any insulation-contracting job when he was not an employee of McCarty. The only evidence presented was Mr. Coates' testimony that he used McCarty products at job locations when he was working with Mr. Hoerner. However, Mr. Coates admitted both that he was not sure that Mr. Hoerner had ever come in contact with McCarty boxes when he was not working for McCarty and that he could not say for sure that Mr. Hoerner was ever present at a jobsite where McCarty products were being used when he was not working for McCarty. Of course, McCarty cannot be held liable for Mr. Hoerner's exposure to asbestos-containing products when he was employed by McCarty.
Accordingly, we find manifest error in the jury's conclusion that the Hoerners proved by a preponderance of the evidence that Mr. Hoerner's exposure to asbestos released into the air by McCarty employees on jobsites when Mr. Hoerner was working for another employer was a substantial factor in causing Mr. Hoerner's asbestosis because his exposure was frequent and regular. Because the Hoerners' failed to carry their burden of proof on this issue, we reverse the judgment to the extent it imposes liability on McCarty as an employer of other insulators.

2. Liability as professional vendors
Following the trial in this matter, the jury answered "yes" to the following questions concerning Eagle and McCarty:
2. Do you find, by a preponderance of the evidence, that any of the following defendants were negligent in the sale or installation of unreasonably dangerous asbestos products to which Barry Hoerner was significantly exposed when he was not an employee of the company, and this exposure was a substantial factor in bringing about his injury-asbestos?
* * * * *
17. Do you find, by a preponderance of the evidence, that any of the following *59 defendants was a professional vendor of unreasonably dangerous asbestos products, during a period of time Barry Hoerner was not an employee of said corporations, and he was significantly exposed to those asbestos products and this exposure was a substantial factor in bringing about his injury-asbestosis?
The "professional vendor" theory of liability in Louisiana was initially introduced by Justice Barham's concurrence in Peltier v. Seabird Industries, Inc., 309 So.2d 343 (La.1975), where he stated as follows:
The best solution to the above problem can come from the theory that a "professional vendor" who deals in particular items for sale to the extent that the public looks upon him, the merchant, as representing the quality of the thing, is equated to the position of a manufacturer. In such a case the public is led to believe that the vendor is completely knowledgeable of good and bad products because he makes his livelihood from repetitive sales of these items. The consumer may never know the manufacturer often does not care to know the manufacturerfor the consumer has, by mass communication, been led to believe that the seller guarantees the quality of the thing sold as though he were a manufacturer. As he holds out to the consumer his expertise in certain wares, merchandise or other things, the law should impute to the commercial merchant knowledge of defects in the things he sells. In modern commerce where the retail merchant has effectively insulated the buyer from the manufacturer through numerous middle men, there are valid reasons for imputing to the "professional" commercial merchant or vendor knowledge of any redhibitory vice in the thing he sells. The modern merchant not only hawks his wares, but he also constantly sells himself and people buy on the basis of the reputation held out by the merchant. His products have come through wholesaler, distributor, shipper and manufacturer in many cases. The things he sells have come from all over the world. The commercial vendor should be responsible for selecting reliability when he chooses the sources of his goods. The merchant can protect himself for recourse when there appears a vice in the thing sold. The consumer is too often left only with recourse against his immediate vendor.
Id. at 345.
The Louisiana Supreme Court officially adopted the "professional vendor" theory of liability in Chappuis v. Sears Roebuck & Co., 358 So.2d 926 (La.1978)[1], in which the court stated, in pertinent part, as follows:
The responsibility of Sears is the same as that of the manufacturer. First, it held the product out to the public as its own. Penn v. Inferno Manufacturing Corp., 199 So.2d 210 (La.App. 1st Cir.1967). Second, the size, volume and merchandising practices of Sears, unlike those of Reliable Motors in Spillers v. Montgomery Ward et al., 282 So.2d 546 (La.App. 2d Cir.1973), bring Sears within the class of "professional venders," who are presumed to know of the defects in their wares. See Morrow, Warranty of Quality, 14 Tul.L.Rev. 529, 539 (1940). *60 Id. at 930. The Louisiana First Circuit Court of Appeal has further expounded on the "professional vendor" doctrine, as follows:
As can be seen from the language in Chappuis, a professional vendor is a retailer who does more than simply sell a certain product or products; it must engage in practices whereby it is capable of controlling the quality of the product, such that the courts are justified in treating the retailer like a manufacturer. We do not believe that the supreme court in Rowell [v. Carter Mobile Homes, Inc., 500 So.2d 748 (La.1987) ][2] intended to expand the scope of Chappuis to impose manufacturer liability on all retailers who are simply in the business of selling a product.
Nelton v. Astro-Lounger Manufacturing Co., Inc., 542 So.2d 128, 132 (La.App. 1 Cir.1989).
Thus, this court must consider the following two factors cited in Chappuis in order to determine whether the jury properly found that Eagle and McCarty were liable to the Hoerners' as professional vendors of asbestos-containing products: (1) whether they held the products out to the public as their own, and (2) their size, volume, and merchandising practices.

a. Eagle
At trial, Eagle President Fred Schuber Jr. testified on direct to the following facts. Eagle, which was originally called Eagle Asbestos and Packing Co, did contract work on vessels and at oil refineries in the "corridor" between New Orleans and Baton Rouge. Eagle also operated a fabrication shop, where it cut products and made things like special fittings, blankets, and pads. Some of the finished products were then put into boxes onto which the Eagle name had been stenciled; the boxes did not contain any warnings. Eagle sold some products to customers, and sometimes purchased products from other contractors when it ran short of something it needed.
Eagle never manufactured any materials. However, contractors sometimes purchased one another's products if they ran short of a particular material. Contractors tried to minimize that practice, because they then had to pay the other contractor's mark-up price. Although Eagle sold products manufactured by others, Eagle never designed any asbestos-containing products, never sold any asbestos-containing product under its own name, and never re-labeled any product. Eagle did sell Foamglas under its own name, but that product did not contain any asbestos. Eagle never wanted to hold itself out as a manufacturer.
Eagle used block products that came from the manufacturer to build pipe covering in the fabrication shop, where it cut the block into cylindrical shapes. The purpose of the fabricating machine was simply to cut the insulation to a certain size. Because the fabricated products took up more room than the block products, some fabricated products were placed in boxes bearing Eagle's name. The union contract required that union workers fabricate any fittings they installed. Eagle was totally dependent on manufacturers for information about products. Fibreboard Corp. was the primary source of pipe covering and block to Eagle, and Fibreboard never warned Eagle about the dangers of asbestos. On September 29, 1971, Eagle received a notice from Fibreboard that it had developed a non-asbestos product, but *61 even that notice contained no warning about the possible dangers of asbestos.
In response to questions from the Hoerners' attorney, Mr. Schuber III admitted that Eagle sprayed Limpet, as indicated by a 1945 yellow pages ad; that Eagle was once the exclusive distributor of Eagle Picher products, as indicated by a 1947 yellow pages ad; that Eagle once offered pre-formed Coltemp elbows for sale, as indicated by a 1969 yellow pages ad; that Eagle sold Unibestos at one time, and that Eagle was once the exclusive distributor of Fibreboard products in South Louisiana. Most of those products were used by Eagle employees, he said. Moreover, when confronted with evidence of the sales, Mr. Schuber III acknowledged sales of various asbestos-containing products made by Eagle to Avondale on various dates in the late 1970's, including one sale dated September 8, 1980. However, he said, Avondale specified asbestos-containing materials even in the 1970's and 1980's.
Mr. Schuber III admitted that Eagle never tested any product to determine the percentage of asbestos content or to see how much asbestos was released when it was handled; nor did Eagle ever do any medical tests to determine diseases caused by products in its boxes. Eagle stopped selling asbestos-containing pipe covering and block in 1972, but continued to sell asbestos cloth until later in the 1970's.
On the basis of the above evidence, we find that the jury was not manifestly erroneous in finding that the Hoerners proved by a preponderance of the evidence that Eagle was liable as a professional vendor for Mr. Hoerner's contraction of asbestosis. The evidence is sufficient to prove both that Eagle held the products out as its own as a part of its merchandising practices, and that Eagle had sufficient size and volume to qualify for the status of professional vendor. Accordingly, Eagle meets the test for being a professional vendor, as defined by the jurisprudence. Because the Hoerners carried their burden of proof on this issue, we affirm the trial court judgment to the extent it imposes liability on Eagle as a professional vendor.

b. McCarty
At trial, the Hoerners' primary claim against McCarty was that McCarty sometimes sold products to other employers, including some of Mr. Hoerner's employers. Mr. Walther testified that B & B got boxes of materials from McCarty, and that he had often seen boxes bearing McCarty's name. He never saw any warnings on those boxes. Moreover, he made fittings in the McCarty shop using asbestos products, and was required to saw them, creating dust. He also put products into boxes bearing the McCarty or McCarty-Branton logo. On cross examination, Mr. Walther admitted that he didn't specifically remember McCarty products being swapped among contractors.
McCarty president Harold Thomas Branton testified that McCarty was at one time the exclusive distributor of Johns Manville thermal insulation products in the area, and that those products were used by union workers. He admitted that McCarty did no air monitoring between 1957 and 1966, and that it had no written safety procedure or warnings regarding handling of asbestos products. In fact, he was unaware that asbestos could cause problems during that period.
Mr. Hoerner stated that he used McCarty thermal insulation products on numerous jobs throughout his career as an insulator, even when he was not working for McCarty, and that his co-workers often used them. McCarty products were used to insulate hot piping and vessels, he said, *62 and workers were required to saw them with a handsaw, which caused it to release a lot of dust. Sometimes when working on vessels and pipe racks, union employees would be working above and below one another cutting insulation, sending dust down on those working below them. At such times, the workers' clothes would be covered with dust, and his nose would become stopped up from breathing dust, Mr. Hoerner said.
On the basis of the above evidence, we find that the jury was not manifestly erroneous in finding that the Hoerners proved by a preponderance of the evidence that McCarty was liable as a professional vendor for Mr. Hoerner's contraction of asbestosis. The evidence is sufficient to prove both that McCarty held the products out as its own as a part of its merchandising practices, and also that McCarty had sufficient size and volume to qualify for the status of professional vendor. Accordingly, McCarty meets the test for being a "professional vendor," as defined by the jurisprudence. Because the Hoerners carried their burden of proof on this issue, we affirm the trial court judgment to the extent it imposes liability on McCarty as a professional vendor.

3. Executive officer liability
In addition to finding that Eagle and McCarty were liable for Mr. Hoerner's contraction of asbestosis, the jury also answered "yes" to the following question concerning Eagle's executive officers, Mr. Schuber Jr. and Mr. Schuber III, and McCarty's executive officers, Mr. Branton and Mr. McCarty:
20. Do you find, by a preponderance of the evidence, that any of the following executive officers were negligent in the performance of a delegated duty, which was a proximate cause of the injury to Barry Hoerner?
Eagle's and McCarty's executive officers appeal those findings.
Prior to the 1976 amendments to the workers' compensation laws, workers were not prohibited from seeking recovery for work-related accidents and injuries from executive officers of their employers, provided the following test, established by Canter v. Koehring Co., 283 So.2d 716 (La.1973), was met:
1. The principal or employer owes a duty of care to the third person (which in this sense includes a co-employee), breach of which has caused the damage for which recovery is sought.
2. This duty is delegated by the principal or employer to the defendant.
3. The defendant officer, agent, or employee has breached this duty through personal (as contrasted with technical or vicarious) fault. The breach occurs when the defendant has failed to discharge the obligation with the degree of care required by ordinary prudence under the same or similar circumstances-whether such failure be due to malfeasance, misfeasance, or nonfeasance, including when the failure results from not acting upon actual knowledge of the risk to others as well as from a lack of ordinary care in discovering and avoiding such risk of harm which has resulted from the breach of the duty.
4. With regard to the personal (as contrasted with technical or vicarious) fault, personal liability cannot be imposed upon the officer, agent, or employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiff's damages. If the defendant's general responsibility has been delegated with due *63 care to some responsible subordinate or subordinates, he is not himself personally at fault and liable for the negligent performance of this responsibility unless he personally knows or personally should know of its non-performance or mal-performance and has nevertheless failed to cure the risk of harm.
Id. at 721.
The Louisiana Supreme Court further explained as follows in Cole, 599 So.2d 1058:

Canter stands for the proposition that a suit against an executive officer is for his personal, as opposed to derivative, fault. We expressly recognized this distinction in Boyer v. Johnson, 360 So.2d 1164, 1166 n. 1 (La.1978), and find our reasoning in Boyer, supra, controlling:
Prior to Act 147 of 1976, an officer or agent of the employer corporation could be held liable in tort for his own personal fault, notwithstanding the employer's immunity. La. R.S. 23:1101 (prior to 1976 amendment); Canter v. Koehring Co., 283 So.2d 716 (La.1973). [The executive officer] is being sued for his own personal fault in disregarding [certain] statutes, not for imputed or vicarious negligence; whatever his relationship to the employer corporation, he is a distinct person and may be sued as such for his own fault, which occurred prior to the effective date of Act 147 of 1976.
Id. at 1074.
All of the executive officers who have appealed the trial court judgment in this case claim that the Hoerners failed to prove the fourth prong of the Canter test stated abovei.e., that they had a "personal duty" to provide Mr. Hoerner a safe place to work, as opposed to general administrative duties. In making this argument, the executive officers essentially concede that the record evidence is sufficient to fulfill the first four elements for finding executive officer liability.
Predictably, the executive officers in question argue for a very narrow interpretation of the personal duty requirement established by Canter. For example, the Schubers argue that executive officer liability may be imposed only if the officer has or had "day-to-day supervision" of the employee in question. On the other hand, the Hoerners argue for a broader interpretation of the fourth Canter requirement than that set forth by the executive officers, asserting that an executive officer should be held liable for an employee's injury under Canter "if he had any responsibility for providing Mr. Hoerner with a safe place within which to work."
However, we reject both of these suggested interpretations of the personal duty requirement because they are not supported by the jurisprudence interpreting that provision. For example, in Young v. Logue, 94-0585 (La.App. 4 Cir. 5/16/95), 660 So.2d 32, this court considered a number of factors in order to determine whether the executive officer in question had a personal duty to provide the plaintiff a safe place to work, including his responsibility for safety in the company and his ability to control the purchase and availability of safety equipment and supplies. See, Id. at 21-22, 660 So.2d at 48. More recently, in Hampton v. Rubicon Chemicals, Inc., 579 So.2d 458 (La.App. 1 Cir. 1991), the court found that a person may not be considered an executive officer unless the person has "some personal contact with the responsibility toward the injured employee." Id. at 466.
Accordingly, we find that the correct test to be applied to determine whether the executive officers in this case are liable for Mr. Hoerner's contraction of asbestosis whether the executive officer in *64 question had some direct duty to provide Mr. Hoerner a safe place to work, including some control over purchase and availability of equipment and supplies. Thus, we will examine the record evidence regarding each of the executive officers involved in the instant case, in order to determine whether the evidence is sufficient to prove the existence of a personal duty as contemplated by Canter and its progeny.

a. Mr. Schuber Jr. and Mr. Schuber III
The Schubers were cast in judgment as executive officers of Eagle, where Mr. Hoerner was employed at various times in 1958, 1965, 1967, 1971, and 1974. Defense exhibit 20, Mr. Hoerner's Social Security printout, shows that Mr. Hoerner's entire earnings from Eagle totaled only $2,284.18, for intermittent work at various points during the above-listed years. Thus, the Schubers claim that Mr. Hoerner's employment with Eagle was so short and intermittent that the record contains no basis for any executive officer liability against any Eagle executive officers. However, we reject the assumption implicit in the Schubers' argument that exposure to asbestos-containing products during an employee's tenure with a given company cannot as a matter of law be considered a "substantial factor" in an employee's contraction of asbestos-related disease if that employment is only for a very short period of time. The "frequent and regular" requirement refers to the quality of the exposure during the employment period, not to the length of that period.
Mr. Hoerner testified that he worked for Eagle as an insulator helper and as a mechanic, working on ships, and performing industrial and commercial work. He also testified without elaboration that both of the Schubers were responsible for making sure he had the equipment he needed when he worked for Eagle.
However, Eagle President Mr. Schuber Jr. stated at trial that he was never personally responsible for the safety of Eagle employees because the company designated other employees as superintendents. Nevertheless, Mr. Schuber Jr. admitted that he was an officer with the Master Insulators Association, and that he negotiated contracts with the union for members to do work for his contracting business. Moreover, he visited Eagle's fabrication shop and occasionally went out on a job to see what the workers were doing. He admitted that as president of Eagle, he had "ultimate" responsibility for safety and for contracts. He said that he was personally unaware of problems associated with asbestos until 1972, and that he did not personally warn any employees of the hazards of asbestos or conduct any air monitoring prior to that time.
Based on the evidence presented at trial, we find that the jury was not manifestly erroneous in finding that the Hoerners' carried their burden of proving both that Mr. Schuber Jr. owed a personal duty to provide Mr. Hoerner a safe place to work and that Mr. Schuber Jr. breached such a duty. Mr. Schuber's own testimony indicates that he had responsibility for providing his employees a safe place to work, including control of purchasing and availability of equipment and supplies.
Mr. Schuber Jr. testified at trial that he delegated some responsibility for safety to Mr. Schuber III at times when he was a superintendent on a job; however, he did not mention any particular years or periods of time. Moreover, Mr. Schuber III claims that it was impossible for him to have any responsibility for Mr. Hoerner's safety because he was not employed full-time by Eagle until 1972. Mr. Hoerner's Social Security printout shows *65 that he only worked for Eagle one time after 1972, in 1974, during which time he earned $111.20, meaning that he worked only two or three hours, Mr. Schuber III asserts. No evidence indicates that Mr. Schuber III supervised Mr. Hoerner's work during that two- to three-hour period. Mr. Schuber III did not become vice-president of Eagle until 1980, and Mr. Hoerner never worked for Eagle after Mr. Schuber III became vice-president. Moreover, Mr. Schuber III notes correctly that no evidence was presented at trial concerning Mr. Hoerner's working conditions at Eagle in 1974. Because the record contains no evidence that Mr. Schuber III had a personal duty to provide a safe place to work to Eagle employees at a time when Mr. Hoerner was an Eagle employee, we find that the jury was manifestly erroneous in finding that the Hoerners carried their burden of proving either that Mr. Schuber III owed a personal duty to provide Mr. Hoerner a safe place to work or that Mr. Schuber III breached such a duty to provide Mr. Hoerner a safe place to work.
Accordingly, the portion of the trial court judgment imposing executive officer liability on Mr. Schuber Jr. is affirmed, while the portion of the trial court judgment imposing liability on Mr. Schuber III is reversed.

b. Mr. McCarty and Mr. Branton
Mr. McCarty was found liable to the Hoerners as President of McCarty Company, while Mr. Branton was found liable as vice-president of McCarty-Branton from 1957 to 1966. For the sake of consistency, we will continue to refer to both corporations as "McCarty." Mr. Hoerner performed various jobs for McCarty during the years 1965, 1966, 1967, 1968, and 1971.
At trial, Mr. Walther testified that Mr. Branton and Mr. McCarty determined which contracts Union 53 members would work on, and that Mr. Branton was responsible both for getting asbestos-containing products to the jobsite and for making sure that workers had the equipment they needed. Mr. Hoerner testified without elaboration that Mr. Branton and Mr. McCarty were both responsible for making sure he had everything he needed when he worked for McCarty between 1957 and 1966.
Mr. McCarty was deceased prior to the time of trial in this matter, and therefore did not testify at trial. Moreover, the record contains no evidence beyond Mr. Hoerner's general statement to indicate that Mr. McCarty had a personal duty to provide Mr. Hoerner a safe place to work. In the absence of more specific evidence concerning Mr. McCarty's role in the company and relationship to McCarty employees, we find that the jury was manifestly erroneous in finding that the Hoerners carried their burden of proving either that Mr. McCarty owed a personal duty to provide Mr. Hoerner a safe place to work or that Mr. McCarty breached such a duty.
Mr. Branton, however, testified, that he was responsible for the Union contracts during the time he was vice-president of McCarty between 1957 and 1966 because he was the president of the Master Insulators Association. Part of his responsibility was negotiating safety requirements for union workers. As part of the contract, McCarty agreed to provide respirators to union employees "when required," meaning whenever dusty conditions existed. Mr. Branton therefore admitted that he knew that McCarty should provide respirators if any employee was handling insulation materials that created dust, and that he was responsible for making sure employees got products they needed to do their jobs.
*66 Mr. Branton stated that McCarty was in the business of contracting and distributing industrial insulations. However, McCarty never manufactured any products. He stated that he never knew, read, heard, or was told that asbestos was harmful between 1957 and 1966. In fact, his office was in the same building where the products were stored, and he never wore a mask or respirator. He found out about the dangers of asbestos in approximately 1971, when he was told by a supplier of asbestos-containing products; he immediately disposed of the asbestos-containing products in the warehouse when he found out. The only time he was vice-president of McCarty when Mr. Hoerner was an employee was in 1965 and half of 1966, Mr. Branton said.
Nevertheless, we find that the jury was not manifestly erroneous in finding that the Hoerners carried their burden of proving both that Mr. Branton owed a personal duty to provide Mr. Hoerner a safe place to work and that Mr. Branton breached that duty. Mr. Branton admitted that he knew that McCarty should have provided respirators on jobs where dust existed and that he had both the duty to provide McCarty employees with a safe place to work, and control of purchasing and availability of safety equipment and supplies.
Accordingly, the portion of the trial court judgment imposing executive officer liability on Mr. McCarty is reversed, while the portion of the trial court judgment imposing executive officer liability on Mr. Branton is affirmed.

B. Liability of settling defendants
Prior to trial in this matter, the Hoerners settled with a number of named defendants, including Flintkote, Taylor-Seidenbach, Reilly-Benton, Armstrong Contracting, and Johns Manville. Nevertheless, the jury found that all of these nine settling defendants were liable for damages flowing from Mr. Hoerner's contraction of asbestosis. As a result, the trial court reduced the Hoerners' damage award by one virile share for the liability of each of the settling defendants listed to whom the jury assigned fault.
In their cross appeal, the Hoerners assert that the jury improperly cast those settling defendants in judgment, asserting that the record contains insufficient evidence to support the judgments. Under Louisiana law, the burden of proving at trial the liability of a settling defendant falls on the remaining defendants. Raley v. Carter, 412 So.2d 1045, 1047 (La. 1982).
We note that the record contains evidence concerning many of these defendants relative to Mr. Hoerner's exposure to asbestos-containing products during periods he was employed by several of the settling defendants. However, as stated above, the trial judge entered partial summary judgment in favor of the defendants who had employed Mr. Hoerner, finding that neither employers nor their insurers could be held liable to the Hoerners for Mr. Hoerner's exposure to asbestos products during any period of time Mr. Hoerner was actually employed by those companies, because workers' compensation is the Hoerners' exclusive remedy against employers. LSA-R.S. 23:1032(A). Thus, we must consider whether the remaining defendants carried their burden of proving that Mr. Hoerner was substantially exposed to asbestos-containing products manufactured, owned, or controlled by the settling defendants during times when he was not employed by those defendants.

1. Flintkote
The only time Flintkote was specifically mentioned during the trial of this matter *67 was Mr. Hoerner's testimony that Flintkote manufactured products called C-19 and Thermatex-B, and his testimony that he worked with Flintkote mastics. Mr. Hoerner did not specify when he worked with such products or the quality of his exposure to such products. Moreover, despite their burden to prove the liability of settling defendants, the remaining defendants failed to present any other evidence relative to Mr. Hoerner's exposure to products manufactured, owned, or controlled by Flintkote at any time when Mr. Hoerner was not employed by Flintkote.
Accordingly, we find manifestly erroneous the jury's conclusion that the record evidence was sufficient to prove that Mr. Hoerner's exposure to asbestos-containing products manufactured, owned, or controlled by Flintkote during a time when Mr. Hoerner was not employed by Flintkote constituted a "substantial factor" in causing his asbestosis. We reverse the trial court judgment to the extent it reduced the Hoerners' damage award by one virile share for the liability of Flintkote.

2. Taylor-Seidenbach
The only evidence in the record relative to Mr. Hoerner's possible exposure to asbestos-containing Taylor-Seidenbach products during a time when he was not employed by Taylor-Seidenbach was Mr. Schuber III's testimony that Taylor-Seidenbach handled Kaylo pipe covering, and the statement in Claude Marquette's deposition, which was read at the trial of this matter, that Taylor-Seidenbach sold a limited amount of materials to Marquette Insulations. There is no evidence concerning Mr. Hoerner's exposure to either of those products when he was not employed by Taylor-Seidenbach.
Accordingly, we find manifestly erroneous the jury's conclusion that the record evidence was sufficient to prove that Mr. Hoerner's exposure to asbestos-containing products manufactured, owned, or controlled by Taylor-Seidenbach during a time when Mr. Hoerner was not employed by Taylor-Seidenbach constituted a "substantial factor" in causing his asbestosis. We reverse the trial court judgment to the extent it reduced the Hoerners' damage award by one virile share for the liability of Taylor-Seidenbach.

3. Reilly-Benton
Despite their burden to prove the liability of settling defendants, the remaining defendants in this case failed to present any evidence relative to Mr. Hoerner's exposure to products manufactured, owned, or controlled by Reilly-Benton at a time when he was not employed by Reilly-Benton. Accordingly, we find manifestly erroneous the jury's conclusion that the record evidence was sufficient to prove that Mr. Hoerner's exposure to asbestos-containing products manufactured, owned, or controlled by Reilly-Benton during a time when Mr. Hoerner was not employed by Reilly-Benton constituted a "substantial factor" in causing his asbestosis. We reverse the trial court judgment to the extent it reduced the Hoerners' damage award by one virile share for the liability of Reilly-Benton.

4. ANCO
Mr. Feraci stated that he and Mr. Hoerner used ANCO products at Allied Chemical when they were working for National Maintenance Co. Moreover, Mr. Feraci also said, ANCO's name appeared on the boxes containing the products they used on that job. Mr. Schuber III testified that ANCO handled Kaylo pipe covering. We find that testimony sufficient to carry the remaining defendants' burden of proving that Mr. Hoerner was substantially exposed *68 to asbestos-containing products manufactured by ANCO while he was working for National Maintenance at Allied Chemical.
Accordingly, we find no manifest error in the jury's conclusion that the record evidence was sufficient to prove that Mr. Hoerner's exposure to asbestos-containing products manufactured, owned, or controlled by ANCO during a time when Mr. Hoerner was not employed by ANCO constituted a "substantial factor" in causing his asbestosis. We affirm the trial court judgment to the extent it reduced the Hoerners' damage award by one virile share for the liability of ANCO.

5. Armstrong Contracting
Evaluation of the record evidence concerning the possible liability of Armstrong Contracting is complicated in this case by the fact that another defendant is named Armstrong World Industries, formerly Armstrong Cork. Therefore, it is often difficult to discern which defendant the witnesses are referring to when they discuss "Armstrong." However, our careful review of the record evidence reveals that the only clear reference to Mr. Hoerner's exposure to asbestos-containing products manufactured, owned, or controlled by Armstrong Contracting at a time when he was not employed by Armstrong Contracting occurs in Mr. Hoerner's testimony that he had worked on a jobsite with Armstrong Contracting employees at times when he was employed by another contractor. However, he did not name any specific locations where that circumstance had occurred.
Despite their burden to prove the liability of settling defendants, the defendants failed to present any other evidence relative to Mr. Hoerner's exposure to products manufactured, owned, or controlled by Armstrong Contracting at a time when Mr. Hoerner was not employed by Armstrong Contracting. Moreover, Mr. Hoerner's testimony alone is insufficient to prove that he was substantially exposed to such products.
Accordingly, we find manifestly erroneous the jury's conclusion that the record evidence was sufficient to prove that Mr. Hoerner's exposure to asbestos-containing products manufactured, owned, or controlled by Armstrong Contracting during a time when Mr. Hoerner was not employed by Armstrong Contracting constituted a "substantial factor" in causing his asbestosis. We reverse the trial court judgment to the extent it reduced the Hoerners' damage award by one virile share for the liability of Armstrong Contracting.

6. Johns-Manville
McCarty Vice-President Harold Thomas Branton testified that Johns-Manville was a supplier and manufacturer of asbestos-containing products sold by McCarty. In fact, according to Mr. Branton, McCarty was at one time the exclusive distributor of Johns-Manville thermal insulation products in the area; those products were used by union workers. Mr. Hoerner stated that he "sometimes" used Johns-Manville asbestos-containing insulation products. He stated specifically that he remembered Thermobestis, as well as Johns-Manville block insulation, pipe covering, and mastics.
We find no manifest error in the jury's conclusion that the record evidence was sufficient to prove that Mr. Hoerner's exposure to asbestos-containing products owned or controlled by John-Manville during a time when Mr. Hoerner was not employed by John-Manville constituted a "substantial factor" in causing his asbestosis. We affirm the trial court judgment *69 to the extent it reduced the Hoerners' damage award by one virile share for the liability of John-Manville.

IV. INSURANCE ISSUES

A. Liability of Home Insurance Co.
Home Insurance Co. issued a single $1,000,000 excess liability insurance policy to Eagle and its executive officers, Mr. Schuber Jr. and Mr. Schuber III, for the period November 1, 1971 to November 1, 1974. Home Insurance seeks reversal of the trial court judgment casting it in judgment for the liability of Eagle, Mr. Schuber Jr., and Mr. Schuber III, "within the limits of its coverage." Home Insurance asserts that the entire $475,000 damage award to the Hoerners in this case is less than the limits on Eagle's underlying primary commercial general liability policies for the period it issued the excess policy to Eagle. Accordingly, Home Insurance asserts, it should have been dismissed from the case.
In Cole, 599 So.2d 1058, the Louisiana Supreme Court held that, under the exposure theory applicable in Louisiana, primary insurance policies issued to a defendant in consecutive years during which the plaintiff in an asbestos case was exposed may be stacked horizontally. Id. at 1074-80. Thus, a single insurer that issued primary policies to a defendant in an asbestos case in consecutive years is liable for an amount up to the limits of all of the policies issued for relevant years added together. Moreover, excess insurers are not required to make indemnity payments until all applicable primary limits are exhausted. See Id.
The record evidence in this case indicates that Employers Commercial Union Insurance Co. issued a primary commercial general liability policy to Eagle during each of the one-year periods when Home Insurance issued the excess policy. The personal injury limit for the November 1, 1971 through November 1, 1972 policy was $100,000 per person. The personal injury limit for the November 1, 1972 through November 1, 1973 policy was $100,000. The personal injury limit for the November 1, 1973 through November 1, 1974 policy was $300,000. Thus, the total of the primary insurance policies for the period November 1, 1971 through November 1, 1974 is $500,000, more than the total award to the Hoerners in the instant case. Under the rule enunciated in Cole, Home Insurance can have no liability under the excess insurance policy for the total general damage award. Accordingly, we reverse the trial court judgment to the extent it imposes liability on Home Insurance. However, we note that the Home Insurance policy may provide other benefits in this case. If so, that issue is reversed to the parties for determination after a final judgment.

B. Liability of Marquette's Insulation insurers
Marquette Insulations was named as a defendant in the Hoerners' petition as one of the companies that acted as professional vendors providing asbestos-containing materials to his employers during his career as an insulator. Mr. Hoerner testified at trial that he never actually worked for Marquette Insulations, but was supplied with Marquette Insulations materials during the 1960's and 1970's.
The jury found that Mr. Hoerner "was significantly exposed [to] unreasonably dangerous asbestos products sold or installed by Marquette Insulations Inc." during 1964, 1965, and 1966, and that that "exposure was a substantial factor in bringing about his injury-asbestosis." Moreover, the jury found that Marquette Insulations "was negligent in the sale or *70 installation of unreasonably dangerous asbestos products to which [Mr.] Hoerner was significantly exposed and which was a substantial factor in bringing about his injury-asbestosis during" 1964, 1965, and 1966. Finally, the jury found that Marquette Insulations "was a professional vendor of unreasonably dangerous asbestosis products to ... which [Mr.] Hoerner was significantly exposed and which exposure was a substantial factor in bringing about his injury-asbestosis during" 1964, 1965, and 1966. Those jury findings are not challenged by any of the appellants in the instant appeal. In fact, the Hoerners argue that the jury properly found Marquette Insulations liable.
Because Marquette Insulations was dissolved prior to the filing of the Hoerners' suit, Marquette Insulations' insurersFidelity & Casualty Insurance Co. and Maryland Casualty Co.were cast in judgment for Marquette Insulations' liability. The liability of those two insurers has been challenged on appeal, as more fully discussed below.

1. Fidelity & Casualty Insurance Co.
Fidelity & Casualty Insurance provided liability insurance to Marquette Insulations during 1964, one of three years during which the jury found Marquette Insulations liable as a professional vendor for damages flowing from Mr. Hoerners' contraction of asbestosis. However, the Hoerners settled with Fidelity & Casualty prior to trial in this matter. Accordingly, the trial court reduced the Hoerners' damage award by one-third of one virile share. Maryland Casualty, whose liability is discussed below, was cast in judgment for the other two-thirds of the one virile share assigned to Marquette Insulations because Maryland Casualty provided liability insurance to Marquette Insulations during 1965 and 1966, the other two years when the jury found that Marquette Insulations was liable to the Hoerners as a professional vendor.
The Hoerners appeal the portion of the trial court judgment reducing their damage award by one-third of one virile share for the liability of Fidelity & Casualty Insurance as liability insurer for Marquette Insulations in 1964. Although it is somewhat inconsistent with their argument that the jury properly found Marquette Insulations liable, the Hoerners argue that the record evidence indicates that Mr. Hoerner was not exposed to products manufactured by Marquette Insulations during 1964. However, Mr. Hoerner testified that he worked with and was exposed to Marquette Insulations asbestos-containing products throughout the 1960's and 1970's. Neither Mr. Hoerner's testimony nor any other record evidence indicates that Mr. Hoerner's 20 years of exposure to Marquette Insulations asbestos-containing products was interrupted in 1964, when Marquette Insulations was insured by Fidelity & Casualty Insurance. Accordingly, we find no merit in the Hoerners' arguments on this issue.
We affirm the trial court judgment to the extent it reduces the Hoerners' damage award by one-third of a virile share for the liability of Fidelity & Casualty, as insurer for Marquette Insulations during 1964.

2. Maryland Casualty Co.
Maryland Casualty provided liability insurance to Marquette Insulations during 1965 and 1966, two of three years during which the jury found Marquette Insulations liable as a professional vendor for damages flowing from Mr. Hoerners' contraction of asbestosis. Maryland Casualty claims that the trial court judgment was improper for two reasons: (1) the Hoerners' cause of action against Marquette *71 Insulations was preempted three years after the company was judicially dissolved in 1981 under the provisions of LSA-R.S. 12:147(D), and (2) the Hoerners failed to prove the existence of insurance coverage.

a. Preemption
Under the provisions of LSA-R.S. 12:147(D), a claim against a dissolved corporation is "barred perpetually and peremptorily" if not brought within three years of its dissolution. Thus, Maryland Casualty argues, claims against an insurer of a dissolved company are also perempted. However, Maryland Casualty admits that LSA-R.S. 12:173(A) specifically limits the peremption to causes of action accruing before 1969. Thus, the real question to be decided is whether Mr. Hoerner's claim against Marquette Insulations accrued before 1969. Maryland makes some convoluted arguments relative to why the Hoerners' claim against Marquette Insulations did not accrue before 1969, but its primary argument is that because Mr. Hoerner did not contract asbestosis before 1969, his claim did not accrue before 1969. Maryland Casualty admits that evidence presented at trial indicates that Mr. Hoerner was exposed to asbestos products sold or installed by Marquette Insulations during the years 1964, 1965, and 1966.
The issue of when the Hoerners' claim against Marquette Insulations, and thus Maryland Casualty, accrued is controlled by the Louisiana Supreme Court's decision in Cole, 599 So.2d 1058. Cole established a "significant exposure" test for determining when a cause of action accrues in a long-latency disease case. Abadie v. Metropolitan Life Insurance Co., 00-344, p. 16 (La.App. 5 Cir. 3/28/01), 784 So.2d 46, 64. Because the evidence indicates that Mr. Hoerner was significantly exposed to asbestos-containing products manufactured by Marquette Insulations in 1964, 1965, 1966, the Hoerners' cause of action accrued prior to 1969, making LSA.R.S. 12:148(C) inapplicable to this case. Thus, we find no merit in Maryland Casualty's peremption arguments.

b. Proof of insurance coverage
Maryland Casualty also claims that the Hoerners failed to prove that Maryland Casualty provided liability coverage to Marquette Insulations during 1965 and 1966. Maryland Casualty's argument on this issue involves two subparts: (1) that the certificates of insurance produced at trial were insufficient to prove coverage, and (2) that the deposition to which those certificates of were originally attached was improperly admitted.

(1) Certificates of insurance
The trial court admitted, as Plaintiffs' Exhibits 1 and 2, certificates of insurance indicating that Maryland Casualty provided general comprehensive liability insurance coverage to Marquette Insulations in 1965 and 1966. Maryland Casualty claims that the certificates of insurance were insufficient to prove insurance coverage, because they do not specify the terms, conditions, and limitations of the alleged coverage. The actual insurance policies are required, Maryland Casualty intimates.
Generally under Louisiana law, the "best evidence" rule requires that originals be produced, absent proof that they could not be located following a diligent effort. Community Bank of Lafourche v. Motel Management Corp. of Louisiana, Inc., 558 So.2d 641, 644 (La.App. 1 Cir. 1990). Thus, the best evidence rule generally would require the introduction of the insurance policies themselves in the instant case. However, Louisiana courts apply the best-evidence rule "sensibly and with reason," and grant a trial court broad *72 discretion in determining the admissibility of evidence. Abadie, 00-344, 784 So.2d 46, 74. Thus, courts do not require that an original document be produced under certain limited circumstances, provided the party seeking to have the parole evidence admitted fulfill certain requirements, as outlined below.
First, a third-party seeking to prove the existence of insurance covering the liability of another party, such as the Hoerners in the instant case, has the burden of proving by a preponderance of the evidence that the instrument is either lost or otherwise unavailable. The Hoerners met this burden in the instant case through the introduction of the deposition of Mrs. Marquette, coupled with the amount of time that has passed since issuance of the policies; additionally, Maryland Casualty does not claim that the policies still exist. Second, the third-party also bears the general burden to show due diligence in its attempt to find the lost or unavailable instrument, a burden that the Hoerners have also met in this case through Mrs. Marquette's deposition, which makes it abundantly clear that the insurance policies in question are no longer in existence. Third, the third party must demonstrate that it did not lose or destroy the document fraudulently or in bad faith. In the instant case, Mrs. Marquette's deposition establishes that the loss of the policy was completely outside the Hoerners' control. See, Ostrager and Newman, Handbook on Insurance Coverage Disputes (2d ed.1999), § 15.04.
Once the third party has met the above burden, he has established a foundation for admission of parole evidence to prove the existence and contents of an insurance policy and coverage. Proper parole evidence to establish the existence of a policy includes such things as correspondence referring to a lost policy, annual reports, minutes of meetings of insurance committees or the company's board of directors, testimony of company officers or their representatives, check registers, ledgers or other accounting records, certificates of insurance, broker's placing slips, and contracts with contractors, vendors, or lessees containing proofs of insurance. In the instant case, the Hoerners presented both the deposition testimony of Mrs. Marquette, a company representative, and the certificates of insurance. See, Id., § 15.06. We find that that evidence was both admissible and sufficient to carry the Hoerners' burden of proof on this issue.
Once a third party has carried its burden of proof as outlined above, the burden shifts to the party claiming a lack of insurance coverage to disprove coverage, or to prove applicable exclusions, exceptions, or exemptions to coverage. See, Id., § 15.05. In the instant case, Maryland Casualty does not dispute either the existence of an insurance policy between itself and Marquette Insulations during 1965 and 1966, or the terms of the policy, relying instead on its admissibility argument. In fact, the record in this case contains no opposing or contradictory evidence to cast suspicion on the validity of the insurance certificates.
Finally, we note that equity requires that such ancient documents as the insurance certificates at issue here be admitted because insurance coverage cannot be proved in any other manner under the facts of this case. We find that the insurance policies attached to Mrs. Marquette's deposition are both reliable and sufficient to prove that Maryland Casualty provided insurance coverage to Marquette Insulations.

(2) Admission of deposition
Maryland Casualty claims also that the certificates of insurance were improperly *73 admitted because they were originally attached to a deposition of Lillian Marquette, widow of Marquette Insulations' founder and operator, Mr. Marquette. Mrs. Marquette's deposition was also admitted at trial as Plaintiff's Exhibit 99, and Maryland Casualty claims that the admission of the deposition was also improper. Mrs. Marquette's deposition was taken on October 10, 1991, in the case of Goodman v. Avondale Industries, Inc., an asbestos case in which Marquette Insulations was a defendant, along with a number of other entities. Mrs. Marquette was deposed as the official company representative, as her husband was already deceased at that time.
Maryland Casualty claims that the trial court improperly admitted Ms. Marquette's deposition because it did not meet the requirements of La. C.C.P. art. 1450, which states, in pertinent part, as follows:
A. At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the Louisiana Code of Evidence applied as though the witnesses were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice, in accordance with any of the following provisions:
* * * * *
(2) The deposition of a party or of anyone who at the time of taking the deposition was an officer, director, or managing agent or a person designed under Article 1442 or 1448 to testify on behalf of a public or private corporation, partnership, or association, or governmental agency which is a party may be used by an adverse party for any purpose.
Maryland Casualty claims that the deposition was improperly admitted because Maryland Casualty was neither present nor properly noticed concerning Mrs. Marquette's deposition, and it was therefore unable to cross-examine her concerning her testimony. However, Maryland Casualty's argument ignores the express language of the article, which allows the use of depositions against a party so long as that party was represented at the deposition. In the instant case, Maryland Casualty is liable to the Hoerners only as liability insurer of Marquette Insulations. Thus, Maryland Casualty and Marquette Insulations are, for all intents and purposes, the same party in this case. Since Marquette Insulations was both properly noticed and present at Mrs. Marquette's deposition, Maryland Casualty was represented at the deposition.
Maryland Casualty also claims that the deposition was improperly admitted because the Hoerners' failed to prove that Mrs. Marquette was unavailable for trial. However, La. C.C.P. art. 1450(A)(2) contains no requirement that the party offering the deposition prove that the deponent was unavailable for trial; that requirement is found in La. C.C.P. art. 1450(A)(3). La. C.C.P. art. 1450(A)(2) applies to the instant case because Mrs. Marquette served as corporate representative for Marquette Insulations at the time the deposition was taken. Moreover, Marquette Insulations was named as a party to this case, despite the fact it had previously been dissolved. Thus, Mrs. Marquette's deposition was properly admitted under La. C.C.P. art. 1450.
Mrs. Marquette's deposition is also admissible in the instant case under the Louisiana Rules of Evidence. La. C.E. art. 801(D)(3)(c) states that the following type of admission is not considered hearsay:

*74 In a civil case, a statement by a declarant when the liability, obligation, or duty of the party against whom it is offered is derivatively based in whole or in part upon a liability, obligation, or duty of the declarant.
In the instant case, the liability of Maryland Casualty, the party against whom the deposition is offered, is cleared derivatively based on the duty of Marquette Insulations, which Mrs. Marquette represented at the deposition in question. Accordingly, we find no abuse of discretion in the trial court's decision admitting Mrs. Marquette's deposition. We find no merit in any of Maryland Casualty's arguments on this issue.

V. DAMAGES ISSUES

A. Physical disability
Defendants Benjamin-Foster and T & N claim that the jury abused its discretion by awarding Mr. Hoerner damages for physical disability because the Hoerners failed to meet their burden of proving with sufficient evidence that Mr. Hoerner was in fact disabled.
The Hoerners' medical expert, Dr. Richard Hebert, who is board certified in internal and pulmonary medicine, noted that Mr. Hoerners' x-rays show the presence of pleural plaques, which indicate that he has asbestosis. Dr. Hebert testified to the following facts: Mr. Hoerner's primary subjective symptom is shortness of breath. However, pulmonary function tests are objective and Mr. Hoerner's studies show a "restrictive pattern." In fact, asbestosis is a restrictive lung disease, not an obstructive lung disease, like asthma or emphysema. Moreover, asbestosis is often a progressive disease, and can worsen even if the person no longer works with asbestos. Mr. Hoerner's x-rays, as well as his symptomology, has changed over time. No known treatment for asbestosis exists.
On cross-examination, Dr. Hebert stated that Mr. Hoerner's 1984 chest x-rays showed some markers of asbestos exposure, although he had no changes in his respiratory symptoms. Mr. Hoerner's asbestosis is mild, but Dr. Hebert stated that a review of Mr. Hoerner's pulmonary function tests over a 20-year period indicates that the decrease in his lung function is greater than would be expected with age. Nevertheless, Mr. Hoerner has experienced a relatively slow progression of actual fibrosis. More importantly, Dr. Hebert had not made an assessment of disability at the time of trial.
Also testifying in favor of the Hoerners was Dr. Leighton E. Stamps, an expert in vocational rehabilitation. Dr. Stamps testified on the basis of a 45 minute conversation with Mr. Hoerner that occurred the week prior to the trial that Mr. Hoerner "had to stop work" after he was diagnosed with asbestosis at the age of 56. He said that he had never had any success placing a client with asbestosis in a job because of the restrictions involved. Moreover, Mr. Hoerner told him that he was experiencing the following symptoms: shortness of breath, difficulty breathing, tiring quickly, having to lie down often, and inability to sustain effort for a long period of time. Mr. Hoerner's condition will probably get worse, and Dr. Stamps testified that he could not find any employment for him. He did not review any of Mr. Hoerner's medical records.
Defendants' vocational rehabilitation counselor, Jeffrey E. Carlisle, who did not talk to Mr. Hoerner or evaluate him, stated his opinion on the basis of his review of records from Dr. Jones and Dr. Hebert that, with the help of a vocational rehabilitation counselor, Mr. Hoerner could return to work in some alternative occupations and environments that would not aggravate *75 his condition. However, Mr. Carlisle admitted that Mr. Hoerner should not be subjected to extreme temperatures, should not work in an occupation that requires constant physical exertion, and should not be exposed to any type of irritant, including dust, fumes, smoke, or chemicals. Although he admitted that he had not placed a person with asbestosis in a job in the past three years, he nevertheless stated his opinion that Mr. Hoerner's medical records contain no evidence that he is disabled from working. Dr. Robert Jones, an expert in diagnosis and risk assessment of persons exposed to asbestos and the epidemiology of asbestos-related disease, stated that a person with asbestosis can function in an ordinary workplace, even with smoke, chemicals, dust, and other irritants, so long has he does not work around substances causing further lung scarring.
On the basis of the above testimony, we find no manifest error in the jury's finding that the Hoerners proved by a preponderance of the evidence that Mr. Hoerner is permanently disabled. Ample basis exists in the record to support the jury's finding that Mr. Hoerner was disabled from working. Thus, the trial court's $100,000 award for permanent disability is hereby affirmed. Because we have found sufficient record evidence to support the trial court's award to Mr. Hoerner for permanent disability, we find no merit in any of arguments asserted by Benjamin Foster and T & N relative to the jury interrogatories on permanent disability. Accordingly, we pretermit further discussion of that issue.

B. Lost wages and earning capacity
In their cross-appeal, the Hoerners claim that the jury improperly failed to award any damages for Mr. Hoerner's lost wages and loss of earning capacity. The Hoerners claim that he is entitled to damages for lost wages and loss of earning capacity because he cannot perform manual work, the only type work he's ever done and the only type work he is trained to perform.
Although Mr. Hoerner testified that his symptoms have gotten worse during the years since his diagnosis with asbestosis and that he is no longer able to do many of the things he once did around his home, the Hoerners failed to present any evidence that Mr. Hoerner sought employment following his diagnosis, or even that he sought the assistance of a vocational counselor in securing employment. In fact, the record evidence indicates that Mr. Hoerner never sought employment following his retirement from the union. Instead, he did maintenance work at an apartment complex that had been given to him by his parents.
As part of their arguments on this issue, the Hoerners claim that the trial court improperly allowed the defendants to present evidence concerning the reasons for Mr. Hoerner's retirement from the union. The Hoerners claim that the admission of this evidence violated the collateral source rule. However, the defendants claim that the testimony was presented to rebut Mr. Hoerners claim that he retired because of his fear of contracting cancer.
We have reviewed all of the testimony in this record and find no merit in any of the Hoerners' arguments on this issue. We are convinced that any testimony concerning the reasons for Mr. Hoerner's retirement, even if improper, had no effect on the result in this case. The record evidence simply is insufficient to prove the Hoerners' claim for loss of earning capacity by a preponderance of the evidence. Accordingly, we affirm the trial court judgment to the extent it denied the Hoerners any recovery for lost wages or earning capacity.

*76 VI. EVIDENTIARY ISSUES

A. Eagle's financial status
Eagle claims the trial court improperly allowed the Hoerners' attorney to ask Mr. Schuber Jr. the following question: "Now, sir, you have testified that the revenues or the amount of money made by Eagle from its contracting work andand its sales was $4 million?" The trial judge overruled Eagle's objection to this question, and, Eagle claims, the issue of Eagle's financial status became a "theme" in the Hoerner's case against Eagle. Eagle claims that the questions were inflammatory, and that the trial court should have declared a mistrial. The Hoerners assert, however, that the question was appropriate because Eagle's counsel referred to Eagle in opening arguments as "a family owned business" housed in a warehouse, and stated that Eagle had "lost money a lot of years," implying that Eagle was a small "Mom and Pop" business enterprise.
In Lewis v. Time Saver Stores, Inc., 599 So.2d 442 (La.App. 4 Cir.1992), this court held that a trial court judgment denying a motion for mistrial may be reversed only if this court makes one of the following findings: (1) that the conduct complained of made it impossible for the jury to reach a proper verdict, (2) that no other remedy would provide relief to the complaining party, or (3) that the admission of the question resulted in `prejudicial misconduct' to the complaining party. Id. at 444. The question complained of by Eagle in the instant case was simply one short controversial episode in the midst of a trial replete with controversy between all of the parties. Moreover, Eagle's revenue was relevant and material to the issues presented, and the information about Eagle's financial status was properly admitted on rebuttal in response to Eagle's strategic attempt to portray itself as a small company. The trial judge also charged the jury that it was not to consider the financial standing of any of the parties in deliberating the case. Because we find that none of the factors quoted in Lewis is present in the instant case, we find no merit in Eagle's arguments on this issue.

B. Settling defendants
Eagle also challenges statements made by the Hoerners' attorney in closing argument to the effect that the defendants at trial were the only parties responsible for Mr. Hoerner's asbestosis. Eagle claims that the trial judge then compounded the problem when he refused to allow the defendants an opportunity to present counter evidence or argument that the Hoerners had received significant sums of money from settling defendants. As a result, the jury improperly found only some of the settling non-parties liable to the Hoerners, Eagle claims. The trial court ruling requires reversal, Eagle claims.
A review of the jury response form in this case easily reveals the flaw in Eagle's argument. The fact that the jury imposed liability on some of the settling non-party defendants and did not impose liability on others indicates that the jury selectively considered the evidence presented at trial against each of the various defendants. Thus, the argument of the Hoerners' attorney did not have the effect on the jury that concerns Eagle.
Moreover, in civil cases, evidence of a settlement agreement is not admissible to prove liability. La. C.E. art. 408. Any amounts received by the Hoerners from settling defendants are considered irrelevant under the existing law because the defendants' liability is reduced by the virile share of all settling defendants that the defendants proved were liable for the Hoerners' injuries. Accordingly, we find no error in the trial court's decision to *77 disallow evidence of the Hoerners' settlement agreement with other defendants.

C. Fear of Cancer Claim
Eagle also contests the trial court's decision to allow Mr. Hoerner to testify concerning his fear that he would contract cancer at some future date without instructing the jury that Mr. Hoerner would be allowed to bring a second suit at some point in the future if he in fact does ever contract cancer. However, following our reading of the record, we find no merit in this argument.
Mr. Hoerner did testify that he had a number of friends and former coworkers over the years who had died of cancer caused by their exposure to asbestos on insulating jobs, and that he had a great fear of cancer for many years. That testimony was appropriately presented in order to prove Mr. Hoerner's general damage claim. It is reasonable for a jury to consider an asbestos victim's cancerphobia as part of his damages. In fact, because cancer is a recognized risk of asbestos exposure, we find specifically that a victim of asbestosis may have a cancerphobia cause of action, if his disease affects him in that manner. Moreover, even if that evidence were disregarded in this case, the record evidence is sufficient to support the trial court's award of $150,000 to Mr. Hoerner for general damages.

D. Expert testimony of James Millette
Benjamin-Foster and T & N claim that the trial court improperly allowed the Hoerners to present the testimony of Dr. James Millette as rebuttal testimony both because it was not proper rebuttal and because it essentially constituted "trial by ambush." The plaintiffs claim that they presented Dr. Millette's testimony purely in rebuttal to the testimony of Dr. Eric Chatfield, the expert witness presented by Benjamin-Foster, to the effect that its fibrous adhesives were "encapsulated, meaning that very little fiber was released from the application or removal of its products." Dr. Millette testified concerning a test he had performed on products similar to Benjamin Foster products the weekend before his testimony, during the course of the trial. Benjamin-Foster and T & N claim that they spend five years preparing their case for trial and that the Hoerners had never revealed the substance of Dr. Millette's testimony in any type of discovery document, meaning they were prevented from preparing to cross-examine Dr. Millette. Moreover, they claim that they were unable to cross-examine Dr. Millette concerning his test by deposition prior to trial because the test was performed during the course of trial.
The Hoerners claim, however, that Dr. Millette was presented in direct rebuttal of Dr. Chatfield. Moreover, according to the Hoerners, Dr. Millette's name had been included on their witness list prior to trial, but Benjamin Foster and T & N failed to take his deposition.
A trial judge has wide discretion in determining whether to allow a witness to testify as an expert, and his judgment will not be disturbed by an appellate court unless it is clearly erroneous. Becnel v. Lafayette Insurance Co., 99-2966, p. 7-8 (La.App. 4 Cir. 11/17/00), 773 So.2d 247, 251, writ denied, XXXX-XXXX (La.02/09/01), 785 So.2d 827. That discretion includes the right to determine the admissibility of a witness' testimony, whether that witness is brought in rebuttal or one that was not listed on the pre-trial order. Abadie v. Metropolitan Life Insurance Co., 00-352, p. 7 (La.App. 5 Cir. 4/11/01), 804 So.2d 11, 17, writ denied, XXXX-XXXX (La.12/14/01), 804 So.2d 643, citing La. C.C.P. art. 1551. Further, rebuttal witnesses are not required to be listed *78 on the pre-trial order. Id. Accordingly, we find no manifest error in the trial judge's decision to admit the testimony of Dr. Millette in the instant case.

VII. VIRILE SHARE CALCULATION
The trial judge divided the $475,000 judgment awarded by the jury into 21 virile sharesone each for the twelve party defendants cast in judgment and one each for the 9 non-party settling defendants cast in judgment. The amount of each virile share was $22,619.05. The judge then reduced the judgment by 9 1/3 virile shares, and awarded the Hoerners 11 2/3 virile shares totaling $263,889.39.
Our decision on appeal requires us to make some adjustments in the amount and method of calculation of the Hoerners' award. The jury found the following 12 party defendants liable: (1) Armstrong World Industries; (2) Asbestos Claims Management; (3) GAF; (4) T & N; (5) Rhone-Poulenc AG; (6) Eagle and its insurers; (7) Mr. Schuber Jr. and his insurers; (8) Mr. Schuber III and his insurers; (9) McCarty and its insurer, (10) Mr. McCarty and his insurer; (11) Mr. Branton and his insurer; and (12) Marquette Insulations' insurers. The jury also found the following nine settling non-party defendants liable: (1) Owens-Corning, (2) Pittsburg-Corning, (3) Flintkote, (4) Uniroyal, (5) Johns-Manville, (6) Armstrong Contracting, (7) ANCO, (8) Reilly-Benton, and (9) Taylor-Seidenbach. This resulted in a total of 21 virile shares.
We subtract two shares, one each for each of the following party defendants, whose liability is reversed in this opinion: Mr. Schubert III and his insurers, Mr. McCarty and his insurers. We also subtract four shares, one each for each of the following non-party settling defendants, whose liability is reversed in this opinion: Flintkote, Taylor-Seidenbach, Reilly-Benton, and Asbestos Contracting. As a result, ten party defendant and five nonparty defendants remain, resulting in 15 virile shares of $31,666.67. We then calculate the Hoerners' final award by subtracting $168,888.91, representing the five virile shares of the liable settling non-party defendants plus one-third of a virile share for Fidelity and Casualty Insurance's liability for Marquette Insulations' liability, from $475,000, in order to reach the final award of $306,111.09.

VIII. CONCLUSION
Accordingly, the portion of the trial court judgment imposing liability on McCarty as the employer of other insulators working on the same job site as Mr. Hoerner is reversed; however, as McCarty is liable under other theories, it retains a virile share of liability for the Hoerners' damages. The portion of the judgment imposing executive officer liability on Mr. Schuber III and Mr. McCarty is also reversed, as is the portion of the judgment finding Home Insurance liable as excess insurer of Eagle, Mr. Schuber Jr., and Mr. Schuber III, within the limits of its coverage. The trial court judgment is further reversed to the extent it reduces the Hoerners' damage award by one virile share each for the liability of each of the following non-party defendants: Flintkote, Taylor-Seidenbach, Reilly-Benton, and Asbestos Contracting. The judgment is amended to award the Hoerners $306,111.07 against the following remaining party defendants: Armstrong World Industries, Asbestos Claims Management, GAF, T & N, Rhone-Poulenc AG, Eagle and its insurers, Mr. Schuber Jr. and his insurers, McCarty and its insurer, Mr. Branton and his insurer, and Maryland Casualty as insurer for Marquette Insulations. In all other respects, the trial court judgment is affirmed.
*79 AFFIRMED IN PART; REVERSED IN PART; AMENDED; RENDERED.
NOTES
[1] This court has held that Chappuis has been legislatively overruled by the adoption of the Louisiana Products Liability Act ("LPLA"), LSA-R.S. 9:2800.52, "which establishes exclusive theories of liability for manufacturers for damage caused by their products." Matthews v. Wal-Mart Stores, Inc., 97-0449 (La. App. 4 Cir. 3/11/98), 708 So.2d 1248, 1249. However, the "professional vendor" status established by Chappuis applies to this case, which is based on facts occurring prior to the adoption of the LPLA.
[2] In Rowell, the court found that a bank that sold mobile homes that it had obtained through foreclosure proceedings was not a professional vendor.